UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| EDWARD WATERS, JR., *as Administrator of the Estate of Edward James Waters*, *Plaintiff*, | CASE NO. 3:24-CV-00858 (KAD) |
| v. | January 2, 2025 |
| PIERRE KORY, M.D., *Defendant*. | |

**MEMORANDUM OF DECISION**
**RE: MOTION TO DISMISS [ECF NO. 14]**

Kari A. Dooley, United States District Judge:

Plaintiff Edward Waters, Jr. ("Plaintiff"), as Administrator for the Estate of his deceased father, Edward James Waters ("Mr. Waters" or "Decedent"), brings this wrongful death action against Dr. Pierre Kory, M.D. ("Dr. Kory" or "Defendant"). The Amended Complaint alleges that Dr. Kory committed medical malpractice when treating Mr. Waters after Mr. Waters contracted COVID-19, which resulted in his death on January 12, 2022. Defendant filed a motion to dismiss primarily on the grounds that he is statutorily immune from liability under the Public Readiness and Emergency Preparedness ("PREP") Act, 42 U.S.C. §§ 247d-6d, 247d-6e. Plaintiff opposes the motion. For the reasons that follow, Defendant's motion is GRANTED in part and DENIED in part.

**Standard of Review**

To survive a motion to dismiss filed pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows

the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 557). Legal conclusions and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are not entitled to a presumption of truth. *Iqbal*, 556 U.S. at 678. Nevertheless, when reviewing a motion to dismiss, the court must accept well-pleaded factual allegations as true and draw "all reasonable inferences in the non-movant's favor." *Interworks Sys. Inc. v. Merch. Fin. Corp.*, 604 F.3d 692, 699 (2d Cir. 2010).

**Allegations and Procedural History**

For purposes of the motion to dismiss, the following allegations are accepted as true. *Allen v. WestPoint-Pepperell, Inc.*, 945 F.2d 40, 44 (2d Cir. 1991). Mr. Waters was a resident of Wilton, Connecticut, who contracted the COVID-19 virus some time on or around November 25, 2021. Am. Compl., ECF No. 24, ¶¶ 2, 9. At the time, Mr. Waters was an "independently living 80 year old man," who also had gout, coronary disease, and other pre-existing conditions related to his heart. Am. Compl. Ex. B ("Medical Decl."), ECF No. 24-2, at 2.[1] Mr. Waters regularly took metoprolol (a beta-blocker to treat high blood pressure) and Eliquis (an anticoagulant to prevent blood clots and stroke), and at the time he contracted COVID, he was also taking prednisone, a corticosteroid, to treat a flare-up of gout. *Id.*; Am. Compl., ECF No. 24, ¶ 10.

After Mr. Waters was diagnosed with COVID-19 and began experiencing symptoms in early December 2021, either Mr. Waters or a family member reached out to Dr. Kory, who began treating him on December 5, 2021. Am. Compl., ECF No. 24, ¶ 11. Dr. Kory allegedly "held

---

[1] According to the declaration attached to the Amended Complaint, Mr. Waters had "coronary disease status post remote CABG, atrial fibrillation, possible paroxysmal supraventricular tachycardia, obesity, hyperlipidemia, bilateral non occlusive renal calculi, myelodysplastic syndrome, dysfibrinogenemia and diverticulitis." Medical Decl., ECF No. 24-2, at 2.

himself out as a counter-culture expert regarding COVID-19 treatment, and sought to raise his prominence and stature through many published articles, media interviews, public testimony, and international travel and speeches." *Id.* ¶ 38. Dr. Kory also promoted telehealth medical services, *id.* ¶ 39, and all of Dr. Kory's visits with Mr. Waters were done remotely via telehealth. *Id.* ¶ 31. On December 6, 2021, Dr. Kory prescribed Mr. Waters four medications to treat his COVID-19: ivermectin (an antiparasitic); a second round of prednisone; spironolactone (a diuretic); and dutasteride (a 5-alpha reductase inhibitor). *Id.* ¶ 13. Dr. Kory was allegedly aware of Mr. Waters' recent use of prednisone when he prescribed these medications. *Id.* ¶ 12.

Several days later, on December 12, 2021, Mr. Waters was admitted to the Stamford Hospital emergency room for shortness of breath and low oxygen levels. *Id.* ¶ 14. Although he did not initially qualify for a COVID antiviral therapy (consisting of remdesivir, an antiviral, and dexamethasone, a corticosteroid), after two days in the hospital, he did receive this therapy, as well as a Symbicort inhaler, which is another corticosteroid. *Id.* ¶¶ 14–15. Mr. Waters was hospitalized for four days, from December 12 to December 16, during which he was treated with several corticosteroids, along with omeprazole, a proton pump inhibitor. *Id.* ¶ 16. Proton pump inhibitors and H2 blockers act as agents for gastrointestinal prophylaxis, a treatment used to "counteract the well-known risk of developing peptic ulcer disease through a protracted course of high dose of corticosteroids," which is particularly risky for the elderly and those taking anticoagulants. *Id.* ¶ 29(d).

After he was released from the hospital, Mr. Waters' condition initially improved. *Id.* ¶ 18. On December 18, 2021, Dr. Kory prescribed him another round of prednisone lasting for fifteen days, which was the fourth round of corticosteroids that Mr. Waters had taken that month alone. *Id.* ¶¶ 18–19. Allegedly, Dr. Kory did not review Mr. Waters' medical records or discharge

3

documents, and he did not prescribe Mr. Waters a proton pump inhibitor or H2 blocker. *Id.* ¶¶ 20–22. Mr. Waters' symptoms improved further throughout late December, *id.* ¶ 23, but on December 29, 2021, his daughter called Dr. Kory to report worsening abdominal pain, which had begun 2 days prior. *Id.* ¶ 24. In response to the symptoms, Dr. Kory reduced the dosage of the prednisone to 20 milligrams (down from 60 milligrams), *id.*, but he did not recognize the warning signs of a stomach ulcer. *Id.* ¶ 29(f).

On December 30, 2021, Dr. Kory was admitted to the Norwalk Hospital emergency room by ambulance for worsening abdominal pain and abdominal distention. *Id.* ¶ 25. The doctors suspected that he had a perforated ulcer in his stomach, which they confirmed after he underwent exploratory surgery. *Id.* ¶ 26. However, despite the efforts of the Norwalk Hospital medical team, Mr. Waters passed away on January 12, 2022, due to complications from his perforated stomach ulcer and multiple organ failure. *Id.* ¶¶ 27–28. Plaintiff, Edward Waters, Jr., was named the Administrator of Mr. Waters' Estate by the Darien-New Canaan Probate Court. *Id.* ¶ 1.

Plaintiff originally filed this case in Connecticut Superior Court in Stamford/Norwalk, on March 29, 2024. Notice of Removal, ECF No. 1, ¶ 1. Defendant timely removed the case to this Court on May 12, 2024. *Id.* Plaintiff then filed the operative Amended Complaint. Am. Compl., ECF No. 24. He asserts three causes of action against Defendant: negligence (Count 1), lack of informed consent (Count 2), and violation of the Connecticut Unfair Trade Practices Act (CUTPA) (Count 3). Defendant moved to dismiss all claims against him.[2]

---

[2] Defendant moved to dismiss the original removed Complaint on May 15, 2024. Mot. to Dismiss, ECF No. 14. After this, Plaintiff amended the original Complaint. Briefing on the motion to dismiss continued after the filing of the Amended Complaint. And the parties thereafter agreed that a stay should enter pending adjudication of the motion to dismiss. *See* ECF No. 30. Therefore, the Court considers the motion to dismiss as against the operative Amended Complaint.

**Discussion**

    I.    <u>Counts 1 and 2: Negligence and Lack of Informed Consent</u>

Plaintiff asserts a common-law negligence claim for medical malpractice.[3] Defendant argues that he is immune by statute from this negligence claim under the federal PREP Act.

The PREP Act provides "broad immunity" for covered persons "'from suit and liability under Federal and state law with respect to all claims for loss caused by, arising out of, relating to, or resulting from the administration to or the use by an individual of a covered countermeasure' during a public-health emergency." *Solomon v. St. Joseph Hosp.* ("*Solomon II*"), 62 F.4th 54, 58 (2d Cir. 2023) (quoting 42 U.S.C. § 247d-6d(a)(1)). PREP Act immunity is only triggered upon a declaration by the Secretary of Health and Human Services ("HHS Secretary"), declaring a public health emergency and defining appropriate covered countermeasures for that emergency. *Id.* (citing 42 U.S.C. § 247d-6d(b)(1)). Effective on February 4, 2020, the HHS Secretary declared the COVID-19 pandemic to be a public health emergency and set out covered countermeasures under the PREP Act. Declaration Under the Public Readiness and Emergency Preparedness Act for Medical Countermeasures Against COVID-19 ("COVID-19 Declaration"), 85 Fed. Reg. 15,198 (Mar. 17, 2020). As relevant here, the HHS Secretary defined "Covered Countermeasures" as "any antiviral, any other drug, any biologic, any diagnostic, any other device, or any vaccine used to treat, diagnose, cure, prevent, or mitigate COVID-19." *Id.* at 15,202.

The Plaintiff challenges Defendant's invocation of PREP Act immunity on three grounds: (1) Defendant is not a covered person under the Act; (2) the high dose of corticosteroids prescribed to Mr. Waters by Defendant was not a covered countermeasure; and (3) Mr. Waters' suffering and

---

[3] Although not cited as such, Plaintiff's claim is clearly a wrongful death action brought pursuant to Conn. Gen. Stat. § 52-555, which is the sole vehicle by which recovery of damages for a person's death may be sought. *Lynn v. Haybuster Mfg., Inc.*, 226 Conn. 282, 295 (1993).

ultimate death were not caused by the use of the covered countermeasure, such that these claims are outside the scope of the PREP Act. Assuming, without deciding, that Defendant was a covered person and that the prescription of prednisone was a covered countermeasure, the Court concludes that Plaintiff's negligence claim does not fall within the scope of the immunity afforded under PREP Act.

The PREP Act provides that the conferred immunity "applies to any claim for loss that has a causal relationship with the administration to or use by an individual of a covered countermeasure." 42 U.S.C. § 247d-6d(a)(2)(B); *see also Mills v. Hartford Healthcare Corp.*, 347 Conn. 524, 568–69 (2023) ("The issue that we must decide is whether the decedent's death was a loss 'caused by, arising out of, relating to, or resulting from the administration to or the use by an individual' of th[e] covered countermeasure under the PREP Act." (quoting 42 U.S.C. § 247d-6d(a)(1))). In determining whether a claim for loss has a "causal relationship" with the use of a covered countermeasure, the court must look at the plaintiff's specific claims, as pled in the complaint. *Mills*, 347 Conn. at 570–71 (collecting cases).

Several state and federal courts have addressed the specific issue of causation when assessing the scope of PREP Act immunity. In particular, the Connecticut Supreme Court's decision in *Mills v. Hartford Healthcare Corp.* is instructive. 347 Conn. 524 (2023). In *Mills*, the decedent was admitted to a hospital with "ST elevation," rapid atrial fibrillation, a sore throat, and a headache. *Id.* at 535. The defendants failed to diagnose the decedent as suffering from ST elevation myocardial infarction (STEMI), which would have required immediate coronary interventions. Under protocols in place at the time, the decedent was administered a test for COVID-19, which took several days to complete. While the test results were pending, the defendants did not admit her to a cardiac catheterization lab, where patients suffering from acute

6

STEMI should be transferred, and as a result, the patient died. *Id.* at 536–37. The defendants argued that the delay in treatment, occasioned by the COVID testing, brought the plaintiff's claims within the scope of PREP Act immunity. The *Mills* court determined that the defendant doctors and hospital were not covered by PREP Act immunity because the patient's death was not "caused by, arose out of, or was related to the improper administration or use of the COVID-19 test," but instead, her death was caused by defendants' failure to correctly diagnose her acute STEMI and admit her to the catheterization lab. *Id.* at 578.

> [T]he fact that a covered countermeasure may have been a cause of the plaintiff's injuries does not mean that a defendant is entitled to immunity under the PREP Act if the plaintiff has alleged that the defendant engaged in tortious conduct that constituted a *distinct and independent cause* of the plaintiff's injuries that itself has no causal relationship to the countermeasure. Put another way, there is no immunity for medical malpractice that does not involve the administration or use of a countermeasure, even if the countermeasure was employed during the plaintiff's treatment and had a distinct and independent causal relationship with the loss.

*Id.* at 576 (emphasis added). Most courts that have addressed this issue agree that the PREP Act does not bestow unlimited immunity, but instead, "leaves room for ordinary claims of negligent or substandard care," even for cases involving a covered COVID-19 countermeasure. *Est. of Maglioli v. Andover Subacute Rehab. Ctr. I*, 478 F. Supp. 3d 518, 532 (D.N.J. 2020); *see Mills*, 347 Conn. at 575–75 & n.31 (collecting cases); *see also Hampton v. California*, 83 F.4th 754, 764 (9th Cir. 2023) (interpreting the PREP Act's causation clause).

Plaintiff's allegations in the Amended Complaint are similar to those faced by the *Mills* court. Both Mr. Waters and the *Mills* decedent were treated with a covered countermeasure before their deaths: in *Mills*, it was a COVID-19 test, and in Mr. Waters' case, it was prednisone. But in both cases, it was, and is, alleged that it was the defendant's *failure* to take other action that caused the decedent's death. In *Mills*, it was the defendants' failure to properly diagnose the decedent

7

and admit her to the catheterization lab, and here, it is Dr. Kory's failure to prescribe a proton pump inhibitor or H2 blocker in conjunction with the prednisone.[4] *See* Am. Compl., ECF No. 24, ¶¶ 25–29, 33.  These actions could have (and as Plaintiff alleges, *should* have) been taken, regardless of the presence of COVID-19 itself or the countermeasures undertaken to combat it. *See Mills*, 347 Conn. at 574 ("But the mere fact that the defendants administered and used a COVID-19 test did not, in and of itself, dictate whether they should or should not proceed with treatment while the test result was pending.  That decision was driven by the defendants' clinical COVID-19 related diagnosis and the hospital's catheterization lab protocol.").  As Plaintiff posits, regardless of the reason for the prednisone prescription, the negligence occurred when Dr. Kory failed to mitigate against the very condition that ultimately occurred and resulted in Mr. Waters' death.  In other words, Plaintiff would still have a viable negligence claim against Dr. Kory if Mr. Waters had not had COVID-19 at all and was instead prescribed such copious amounts of prednisone without a proton pump inhibitor for some other condition.

Accordingly, the Court concludes that Dr. Kory's alleged failure to mitigate against the harmful effects of high doses of corticosteroids is sufficiently alleged to be a "distinct and independent cause" of Mr. Waters' death, even though the corticosteroids were prescribed to treat COVID-19.

Notwithstanding, Defendant seeks to distinguish *Mills* and similar cases on the basis that none of them involved the treatment of COVID-19 itself, but rather, they involved a "failure to act" in the face of other effects of the pandemic.  Reply, ECF No. 28, at 6 n.6.[5]  This is inaccurate.

---

[4] In addition, the Amended Complaint alleges that Dr. Kory failed to recognize the symptoms of or diagnose the stomach ulcer when he learned of Mr. Waters' symptoms in late December.  Am. Compl., ECF No. 24, ¶ 29(e).

[5] Defendant only cites to two cases addressing the "causation" scope of the PREP Act, and neither is applicable to the facts presented here.  *See* Reply, ECF No. 28, at 5, 7 (citing *Politella v. Windham Se. Sch. Dist.*, 325 A.3d 88 (Vt. 2024), and *M.T. ex rel. M.K. v. Walmart Stores, Inc.*, 528 P.3d 1067 (Kan. Ct. App. 2023)).  Both

At least two courts have applied this same principle to cases in which the patients were treated for COVID-19 with covered countermeasures. The plaintiffs in *Wilhelms v. ProMedica Health System, Inc.*, 205 N.E.3d 1159 (Ohio Ct. App. 2023), and in *Solomon v. St. Joseph Hospital* ("*Solomon I*"), No. 20-CV-3213, 2021 WL 10313712 (E.D.N.Y. Sept. 29, 2021), *vacated and remanded on other grounds*, 62 F.4th 54 (2d Cir. 2023),[6] were both placed on ventilators to treat complications from COVID-19. Due to alleged negligence by medical staff, the plaintiffs each developed severe pressure sores from remaining stationary for an extended period. *Wilhelms*, 205 N.E.3d at 1161; *Solomon I*, 2021 WL 10313712, at *1. Both the *Wilhelms* and *Solomon I* courts found that although ventilators were covered countermeasures, the defendants were not protected by PREP Act immunity because the alleged injuries (the pressure sores) did not arise from or relate to the use of the covered countermeasure (the ventilators). As the *Solomon I* court found:

> It is apparent from the parties' submissions that Solomon's claims derive from a common type of hospital-acquired injury that results from not being rotated while stationary. Therefore, the claims arise from issues of alleged failure to uphold a duty and proper standards of medical care, rather than directly from the use of a ventilator or covered countermeasure. While Solomon was indisputably being treated for COVID-19 with a ventilator during the period that he acquired a pressure injury, the claims he has brought are not so inextricably intertwined with the use of a covered countermeasure so as to invoke PREP Act preemption at this stage.

---

*Politella* and *M.T.* dealt with a very specific and distinct issue: whether a parent, whose child obtained the COVID-19 vaccine without their consent, could make out a claim against vaccine providers under the PREP Act. *Politella*, 325 A.3d at 91–92; *M.T.*, 528 P.3d at 1070–71. The courts held that the harm to these plaintiffs could not be untethered from the administration of the COVID-19 countermeasure, the vaccine. In other words, the COVID-19 vaccine was not an incidental component of the plaintiffs' claims; it was the actual basis of their claims, and exactly the kind of claim the PREP Act was written to immunize medical providers from. *See M.T.*, 528 P.3d at 1083–84 (discussing legislative intent in immunizing covered persons from tort claims "based on a defendant's failure to obtain consent").

[6] In *Solomon II*, the Second Circuit did not evaluate the district court's holding that the defendant doctors were not covered by PREP Act immunity. Instead, they vacated and remanded the district court's decision because they found that removal of the case to federal court had been improper. *Solomon II*, 62 F.4th at 63–64. However, the original district court's decision is still instructive.

9

*Solomon I*, 2021 WL 10313712, at *3. Similarly, Plaintiff's claims here, *inter alia*, derive from a failure to prescribe a proton pump inhibitor with the prednisone, not from the administration or use of the prednisone itself.

Therefore, the Court finds that the Defendant is not entitled to PREP Act immunity for the loss asserted by Plaintiff in the Amended Complaint. Defendant's motion to dismiss as to Counts 1 and 2 is DENIED.

II. Count 3: CUTPA

CUTPA provides that "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen. Stat. § 42-110b(a). It also provides that "[a]ny person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment of a method, act or practice prohibited by section 42-110b, may bring an action . . . to recover actual damages." *Id.* § 42-110g(a). A CUTPA claim consists of three basic elements: (1) an ascertainable loss of money or property (2) that was caused by an unfair method of competition or an unfair or deceptive act (3) that occurred in the conduct of trade or commerce. *Cenatiempo v. Bank of Am., N.A.*, 333 Conn. 769, 788–90 (2019).

> [Connecticut courts] have adopted the criteria set out in the cigarette rule by the Federal Trade Commission for determining when a practice is unfair: (1) Whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise . . .; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers . . . . All three criteria do not need to be satisfied to support a finding of unfairness. A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three . . . . Thus, a violation of CUTPA may be established by showing either an actual deceptive practice . . . or a practice amounting to a violation of public policy . . . .

*Ulbrich v. Growth*, 310 Conn. 375, 409 (2013) (alterations and quotations omitted).

The provision of medical services falls within CUTPA's definition of trade or commerce. *Haynes v. Yale-New Haven Hosp.*, 243 Conn. 17, 32 (1997). That said, it is well-established that "professional negligence—that is, malpractice—does not fall under CUTPA." *Id.* at 34. However, the "entrepreneurial exception" to this general rule provides that "only the entrepreneurial or commercial aspects of the profession are covered" by CUTPA. *Id.*; *see Suffield Dev. Assocs. Ltd. P'ship v. Nat'l Loan Investors, L.P.*, 260 Conn. 766, 782 (2002). "[A]lthough physicians and other health care providers are subject to CUTPA, they may be liable only for 'unfair, unconscionable, or deceptive methods, acts, or practices in the conduct of the entrepreneurial, commercial, or business aspect of the practice of medicine.'" *Janusauskas v. Fichman*, 264 Conn. 796, 808 (2003) (quoting *Haynes*, 243 Conn. at 37). "[I]n order to bring [a] claim against [a] health care provider under [CUTPA], the distinction between the business aspects of medicine and the 'actual practice of medicine' or the non-business aspects of medicine is crucial." *Haynes*, 243 Conn. at 37 (alterations and quotations omitted). In discussing the exception as applied to attorney malpractice, the Connecticut Supreme Court has instructed:

> It is not a catch-all provision intended to subject any arguably improper attorney conduct to CUTPA liability. . . . [T]he mere fact that the actions of the attorney and the law firm might have deviated from the standards of their profession does not necessarily make the actions entrepreneurial in nature.

*Suffield*, 260 Conn. at 782.

Plaintiff argues that he has adequately alleged a CUTPA claim against Dr. Kory based upon Dr. Kory's alleged "[un]usual business model through his outspoken criticism of the government's and mainstream medical community's responses to the pandemic." Opp'n to Mot. to Dismiss, ECF No. 26-1, at 23. In particular, Plaintiff alleges that Defendant's political activism "significantly impeded his ability to provide a level of medical treatment to his patients, including Mr. Waters, that met the standard of care." *Id.* at 24. This argument stretches the entrepreneurial

11

exception beyond its breaking point. There are no allegations that Defendant committed any fraud upon Mr. Waters or otherwise engaged in deceitful or unscrupulous behavior toward Mr. Waters. All that is alleged is that Defendant did not meet the medical standard of care in his treatment of Mr. Waters. *Compare* Am. Compl., ECF No. 24, ¶¶ 31–34 (alleging lack of informed consent by Defendant), *with Jump v. Regalcare of W. Haven, LLC*, No. CV-22-6119963-S, 2023 WL 5216624, at *6–7 (Conn. Super. Ct. Aug. 8, 2023) (collecting cases of successful CUTPA claims against medical practitioners, in which the practitioners defrauded plaintiffs, forged signatures, falsified records, and/or billed plaintiffs improperly), *and Vincent v. Essent Healthcare of Conn., Inc.*, 368 F. Supp. 2d 181, 184–85 (D. Conn. 2005) (dismissing CUTPA claims premised upon a for-profit hospital's misleading representations regarding the quality of care it was capable of providing).

Because Count 3 is an impermissible attempt to recast malpractice allegations as CUTPA violations, *see Haynes*, 243 Conn. at 38, Defendant's motion to dismiss Count 3 is GRANTED.

**Conclusion**

As explained above, Defendant's motion to dismiss is GRANTED as to Count 3 and DENIED as to Counts 1 and 2.

**SO ORDERED** at Bridgeport, Connecticut, this 2nd day of January 2025.

                                     /s/ Kari A. Dooley
                                     KARI A. DOOLEY
                                     UNITED STATES DISTRICT JUDGE